**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                          Case No. 3:06-cr-185-J-32HTS

RONALD L. JENKINS

_____

**O R D E R**

**I.**    **Background**

Between October 1998 and February 1999, defendant Ronald L. Jenkins, a police officer with the Jacksonville Sheriff's Office, secured approximately $80,000 in commercial loans from Bank of America (then NationsBank) and AmSouth Bank.  A loan broker and former Bank of America employee, Christopher McQueen, facilitated the transactions between Jenkins and the banks.  Jenkins' intent in securing the loans was to help fund a day care business that he was opening with a group of partners that included other Sheriff's Office employees and their spouses.  However, the loan documents signed by Jenkins stated that the funds were to be used for a different business, J-Nice Security.  The day care business and Jenkins both made some payments on the various loans, but the day care business proved unsuccessful and the loans went into default.

Sometime before August 2001, the government began investigating McQueen for his role in a suspected bank fraud conspiracy whereby McQueen and others would fraudulently submit loan documents in the names of fictitious businesses to certain "receptive" bank

employees who would approve the loans, thereby permitting McQueen and others to then use the funds for their own benefit.[1]  The government eventually turned its attentions to other loan applicants who had used McQueen's loan brokerage and consulting services, including Jenkins.

On August 13, 2001, when Jenkins arrived at work for his shift, he was directed to report to the Jacksonville Secret Service office.  Jenkins was not advised as to the purpose for the visit.  Jenkins arrived at the Secret Service office, alone and in uniform, where Postal Inspector Dexter Brown (or one of his fellow agents) administered <u>Miranda</u> warnings to Jenkins and advised him that agents wished to interview him about a bank fraud scheme. Jenkins agreed to be interviewed and the agents questioned Jenkins about the loans he had secured with the assistance of McQueen and about J-Nice Security, the business for which the loans were approved.[2]

Jenkins explained to Inspector Brown that McQueen had been invited to a meeting of the day care business partners where McQueen advised the partners that the day care business would be unable to secure a loan in its own name and that the individual partners in the group would have to secure their own loans to fund the business.  Jenkins told

---

[1]In 2004, the government indicted McQueen and others (but not Jenkins) on charges of conspiracy, making false statements on loan and credit applications, and bank fraud. McQueen pled guilty to all charges and was sentenced to 33 months in prison.  McQueen and his co-conspirators were ordered to pay $1,468,134.46 in restitution to the defrauded banks. <u>See</u> <u>United States v. McQueen</u>, 3:04-cr-75-J-25HTS (M.D. Fla.), filed March 4, 2004.

[2]Some of the trial testimony suggested that this interview occurred on October 13, 2001. Whether the interview occurred on August 13 or October 13 is not relevant for purposes of the motions before the Court.

2

Inspector Brown that McQueen advised the partners that if they worked any off-duty details or operated other businesses, that commercial loans might be available in the names of those businesses. Jenkins occasionally performed off-duty security work and McQueen suggested that Jenkins give that business a name and seek a loan through that business. Jenkins named his "business" J-Nice Security and obtained a peddler's license. Jenkins told Inspector Brown that Jenkins gave McQueen various financial documents as well as a signed, but otherwise blank, bank loan application and that Jenkins was contacted sometime thereafter and advised that he had been approved for a $50,000 loan from Bank of America.

When Jenkins closed on the loan, the loan application documents presented to him had been fully completed. Jenkins signed the documents and accepted the loan proceeds. During the August 13, 2001 interview, Inspector Brown presented Jenkins with copies of those documents which stated that J-Nice Security had been in business for ten years, employed eleven people and had annual sales in excess of $500,000. Jenkins told Inspector Brown that the information about J-Nice Security that appeared on the documents was false. Jenkins explained to Inspector Brown that Jenkins had not read the documents at the closing and had relied on McQueen as his "banker" to complete the loan paperwork using the financial information that Jenkins had provided to him. Inspector Brown presented Jenkins with similar documents Jenkins had used to secure a $10,000 loan for J-Nice Security from AmSouth; they also discussed an additional $20,000 loan Jenkins received from Am South for J-Nice Security. As to each, Jenkins reiterated his explanation that he had not read the documents at the closings and had relied on McQueen to properly complete them. At the conclusion of the interview, Inspector Brown asked Jenkins to provide a sworn written

3

statement.   Jenkins declined to do so and the interview ended.   Jenkins had no further contact with Inspector Brown or any other government agent regarding the loans.

Nearly five years later, the government indicted Jenkins on charges of conspiracy, bank fraud, and making false statements on loan and credit applications submitted to Bank of America and AmSouth Bank.   On January 19, 2007, at the conclusion of a four day jury trial, and after more than five hours of deliberations, the jury returned a verdict in which it found Jenkins not guilty of conspiring with McQueen and not guilty of the bank fraud count involving Bank of America, but guilty of both bank fraud counts involving AmSouth Bank and guilty of making false statements on loan and credit applications submitted to Bank of America and AmSouth Bank.

Jenkins has now filed several post-trial motions which include the renewal of motions to dismiss the indictment on grounds of pre-indictment delay (Doc. 75) and a Sixth Amendment violation (Doc. 76) (both of which had been denied without prejudice before trial), as well as a motion for new trial based on alleged trial errors (Doc. 74) and for judgment of acquittal on grounds of insufficient evidence (Doc. 77).   The government filed written responses (Docs. 78, 79, 80, 81), defendant supplemented his papers where appropriate (Docs. 85, 86), and the Court heard argument on the motions on April 19, 2007, the record of which is incorporated by reference.

## II.     Discussion

### A.     Motions for Reconsideration of Motions to Dismiss (Docs. 75 & 76) and Post-Verdict Motion for Judgment of Acquittal (Doc. 77)

For the reasons stated on the record when the original motions were filed (see January 16, 2007 Oral Order, Doc. 50), the Court finds that defendant's Motion for Reconsideration of the Motion to Dismiss Indictment Because of Pre-Indictment Delay (Doc. 75, [response Doc. 79]) and Motion for Reconsideration of Motion to Dismiss on Sixth Amendment Grounds (Doc. 76, [response Doc. 78, supplement Doc. 85]) are due to be denied.[3]  Additionally, upon consideration of the evidence presented at trial, and viewing that evidence in the light most favorable to the government, the Court finds the Post-Verdict Motion for Judgment of Acquittal (Doc. 77 [response Doc. 81]) is due to be denied as the jury was presented with sufficient evidence with which to support their verdict. See United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989) (recounting standard for ruling on Rule 29(c) motion).

### B.     Motion for New Trial (Doc. 74)

Jenkins moves for a new trial pursuant to Fed.R.Crim.P. 33, which permits the Court to order a new trial on motion of defendant "if the interest of justice so requires."  United

---

[3]The Court has serious concerns about the pre-indictment delay.  By its own admission, the government delayed bringing this relatively straightforward case for almost five years not because of any investigatory needs but, rather, due primarily to the bureaucratic delay occasioned by the repeated reassignment of the case within the Department of Justice.  This delay had a pernicious effect on both the defendant, anxiously awaiting a final disposition of this matter, and on the trial itself.  However, because I do not find that the government intentionally delayed for tactical advantage, I cannot dismiss the case based on pre-indictment delay.  See United States v. Foxman, 87 F.3d 1220, 1223 (11th Cir. 1996) (requiring both a finding of prejudice and intentional delay for tactical advantage).

States v. Ward, 274 F.3d 1320, 1323 (11th Cir. 2001).  "A district court has much more power to grant a motion for a new trial than it does to grant a motion for judgment of acquittal."  Id. (citation omitted).  "In evaluating a motion for a new trial, 'a district court need not view the evidence in the light most favorable to the verdict.'"  Id. (citation omitted).  Jenkins raises two grounds for a new trial:  first, that the prosecutors' comments about Jenkins' refusal to provide a sworn written statement to Inspector Brown violated Jenkins' rights under the Due Process Clause; and second, that the Court committed reversible error in admitting a government exhibit containing hearsay over Jenkins' objection.

### 1.    Prosecutorial comments on Jenkins' failure to provide written statement

Inspector Brown testified that when Jenkins presented himself in the Jacksonville Secret Service office on August 13, 2001, Brown or another agent administered Miranda warnings to Jenkins before any questioning began.  Brown testified that Jenkins was advised that he had the right to remain silent and that anything he said could be held against him. Doc. 71 at Tr.[4] 25.  Jenkins agreed to be interviewed and he voluntarily answered the agents' questions but, at the conclusion of the interview, Jenkins declined to provide a sworn written statement when Brown asked him to do so.  During the trial, there were three references to Jenkins' failure to provide a written statement.

First, in the government's case-in-chief during Inspector Brown's re-direct examination, the prosecutor asked Brown about the extent of Jenkins' cooperation during their interview, posing the following question:

_____

[4]"Tr." references are to the various pages of the trial transcript excerpts.

6

Q:      At the end of your interview of the defendant, did you ask him to do anything?

A:      Yes.  We asked him if he would provide a written sworn statement to what we just discussed, which is typical with interviews and dialogue encounters you have with witnesses or suspects in an investigation.

Q:      Did he agree to do that?

Doc. 72 at Tr. 34.  At this point, defense counsel objected on grounds of "Fifth Amendment." The prosecutor responded that Jenkins' counsel had "opened the door."  Meanwhile, unheard by the Court or apparently by counsel, Brown had responded to the prosecutor's question by responding, "No."  Doc. 72 at Tr. 34.  The Court called counsel to sidebar where the prosecutor explained that Jenkins' counsel had "opened the door" by eliciting testimony during Brown's cross that gave the impression that Jenkins had been cooperative; Jenkins' counsel argued that his client was simply exercising his Fifth Amendment rights by declining to provide a sworn written statement, stating that the prosecution had "opened up a whole big can of worms" by asking the question.  The Court asked whether the witness had answered the question as posed.  The prosecutor erroneously responded that he had not, and the Court sustained the objection and directed that the question be withdrawn.

Brown's testimony was quickly completed,[5] the government rested and the Court

_____

[5]During his remaining testimony, Brown, who was not privy to the sidebar conference, made what might have been another passing reference to Jenkins' decision not to provide a written statement.  When asked by the prosecutor whether he believed that Jenkins "was entirely forthright and honest with law enforcement on that day," he responded, "I think he was honest with what he was saying initially and forthright.  Toward the end, he just- - which was in his right.  It was voluntary."  The prosecutor then asked, "Without getting into the last question that I asked you [referring to the refusal to give a written statement], what is your view of whether the defendant was honest and forthright?"  Brown responded "Somewhat not complete."  Doc. 72 at Tr. 37.  Jenkins posed no objections during these final questions and has not argued that this was an impermissible comment on his invocation of his right to

denied a defense motion under Rule 29.  Without a break, defense counsel called Jenkins

to the stand.  During this testimony the second reference to Jenkins' failure to provide a

written statement occurred:

> Q:   What was your reaction when Inspector Brown and Agent Lynch showed you those loan applications?
>
> A:   When he presented me with that loan application and I saw what was in that loan application, I said, No, this is not mine, this is not me.  And if I had seen this, I would never have signed that.
>
> Q:   What happened after that?
>
> A:   They asked me a few more questions.  And towards the end they asked me to make a written statement.
>
> Q:   All right.  And did you decide not to do that?
>
> A:   Yes.  And the reason--
>
> Q:   That's all right.  You don't need to go into the reason.  You decided not to do it.  All right.  But you did make- - you did verbally tell them- - you heard Mr. Brown testify that he didn't think that you were totally forthcoming, Mr. Jenkins.  Were you totally forthcoming?

Doc. 72 at Tr. 69.  Jenkins then testified that he told Brown "exactly what happened at that

time," that he had nothing to hide, that he was not trying to hide anything from or otherwise

mislead the agents, and that he "tried to tell them everything there was to tell them about it."

Doc. 72 at Tr. 69-70.

The third reference occurred during Jenkins' cross-examination:

> Q:   [Y]ou told us on direct examination that when you met with Inspector Brown that you didn't have anything to hide, right?

---

remain silent.

8

A:      No.

Q:      And that you were completely honest and forthcoming, correct?

A:      Correct.

Q:      And yet you declined to give a written statement; isn't that correct?

Doc. 72 at Tr. 92-93.  At this point, Jenkins' counsel objected and moved for a mistrial to which the prosecutor responded that counsel had raised the matter on the direct of Jenkins. The Court sustained the objection and called counsel to sidebar.  At sidebar, Jenkins' counsel argued that his client, after hearing Inspector Brown's testimony and without an opportunity to talk to his lawyer before he was called to testify, had simply volunteered his testimony regarding the written statement.  The prosecutor maintained that the matter had been re-opened on direct, to which the Court expressed surprise that the prosecution would ask the question after the earlier sustained objection without getting a ruling in advance as to whether it was an appropriate matter for inquiry.  However, the Court denied the motion for mistrial and the proceedings continued without any further reference by either side to Jenkins' declination to provide a written statement.

Jenkins has now renewed the issue in his motion for a new trial, arguing that the prosecution improperly referenced his failure to provide a written statement in violation of his due process rights as articulated in Doyle v. Ohio, 426 U.S. 610 (1976).  In Doyle, the Supreme Court held that once a suspect had been advised of his rights pursuant to Miranda, any subsequent silence is "insolubly ambiguous" because, rather than indicating guilt, such silence  "may be nothing more than the arrestee's exercise of these Miranda rights."  Id. at 617.  Moreover, Miranda warnings contain "an implicit assurance" that silence will carry no

9

penalty and "it would be fundamentally unfair and a deprivation of due process" to use post-Miranda silence "to impeach an explanation subsequently offered at trial."  Id. at 617-18.[6]

Thus, pursuant to Doyle, the government generally may not make comment on a Mirandized defendant's silence.  "When a Doyle violation occurs, [the Court] review[s] the government's use of the defendant's post-Miranda silence for harmless error."  United States v. O'Keefe, 461 F.3d 1338, 1345 (11th Cir. 2006).  If such a violation is present, "the conviction can stand only if the [ ] court is satisfied beyond a reasonable doubt that the error was harmless." United States v. Tenorio, 69 F.3d 1103, 1106 (11th Cir. 1995).  In evaluating whether error is harmless, the Court considers "the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt."  Id. (citation omitted).[7]

_____

[6]In Doyle, the defendants were given Miranda warnings at the time of their arrests (426 U.S. at 611) and the cases reviewed which discuss "a Doyle issue" invariably involve defendants who likewise maintained silence post-Miranda and post-arrest.  See, e.g., Wainwright v. Greenfield, 474 U.S. 284, 286 (1986).  Here, of course, Jenkins was not arrested, but he was being questioned about a federal crime by law enforcement officers in their offices and was advised of his right to remain silent and told that anything he said could be used against him.  Although it maintains other arguments as to why a Doyle violation is not presented here, the government has not argued that the fact that Jenkins was not arrested deprives him of a basis to raise a Doyle issue.  See United States v. O'Keefe, 461 F.3d 1338, 1346 (11th Cir. 2006) (emphasizing that Doyle's due process considerations "are only implicated by the giving of a Miranda warning" and that "arrest alone is not sufficient" to implicate those considerations).

[7]Citing Greer v. Miller, 483 U.S. 756, 765 (1987), defendant alternatively argues that even if the Court were to determine that no Doyle violation occurred, it should nevertheless find that by asking improper questions regarding defendant's silence, the government engaged in prosecutorial misconduct to such a degree as to violate defendant's due process rights. Because of the result here, the Court need not reach this issue.  However, for the record, the Court notes that it did not view either of the prosecutors as having engaged in "misconduct" within the meaning of Greer or otherwise.

10

The government raises two points as to why no <u>Doyle</u> violation was created on this record.  First, the government contends that Jenkins waived his right to remain silent when he talked with Inspector Brown and Jenkins' subsequent decision not to give a sworn written statement, therefore, was not a taboo subject.  Second, the government argues that even if Jenkins' declination to provide a written statement after the interview was an invocation of his right to remain silent, the government was still permitted to comment on it because it rebutted the false impression created by Jenkins at trial that he had been fully cooperative with the investigation.  The government further maintains that even if a <u>Doyle</u> violation did occur, any error it created was harmless.

There is some authority that a defendant who agrees to speak following advisement of <u>Miranda</u> warnings has, in some circumstances, waived his <u>Miranda</u> rights, thus losing any protection against comments on his subsequent silence.  <u>See, e.g.</u>, <u>Anderson v. Charles</u>, 447 U.S. 404, 408 (1980) (explaining that <u>Doyle</u> bars use of post-<u>Miranda</u> silence but that prosecution may fairly probe content of post-<u>Miranda</u> inconsistent statements without breaching bar against use of silence); <u>Lofton v. Wainwright</u>, 620 F.2d 74, 78 (5th Cir. 1980)[8] (holding that once a defendant "chooses to contradict his post-arrest statements to the police . . . it becomes proper for the prosecutor to challenge him with those statements and with the fact that he withheld his alibi from them," which may result in the jury learning that he exercised his right to silence); <u>United States v. Burns</u>, 276 F.3d 439, 442 (8th Cir. 2002)

---

[8]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

(holding that prosecutor's comment on defendant's silence in response to one question and eventual refusal to answer further questions did not violate <u>Doyle</u> because they were in context of otherwise admissible conversation).  However, in these and other cases reviewed, the courts' determinations that comments on post-<u>Miranda</u> silence were permissible rely at least in part on the purpose for and context within which such commentary was being offered.  <u>See</u> <u>Lofton</u>, 620 F.2d at 78-79 (explaining that because defendant testified to an exculpatory story that contradicted explanation given to police, "all of the post-arrest utterances and the circumstances under which they were made may well become relevant and admissible"); <u>Burns</u>, 276 F.3d at 442 (noting that comment on silence was admissible because it was in context of otherwise admissible conversation which was highlighted by prosecution to show contrast with defendant's "transparently frivolous" exculpatory evidence).  <u>See also</u> <u>United States v. Beechum</u>, 582 F.2d 898, 906 (5th Cir. 1978) (en banc), <u>cert. denied</u>, 440 U.S. 920 (1979) (finding no improper reference to silence under <u>Doyle</u> where prosecutor asked why defendant did not give exculpatory statement to police that he offered at trial and holding that prosecutor's statement was "not a comment on Beechum's silence but rather an appraisal of what Beechum said").

However, none of the cases reviewed (or cited by the parties) have held without qualification that a defendant who speaks post-<u>Miranda</u> but thereafter decides not to answer certain questions or to remain silent loses the benefit of <u>Doyle</u>'s protection.  Indeed, <u>Miranda</u> itself and cases following it demonstrate that typically a defendant's "partial silence" cannot be commented upon.  In <u>Miranda v. Arizona</u>, the Supreme Court explained that "[t]he mere fact that [a defendant] answered some questions . . . does not deprive him of the right to

refrain from answering any further inquiries." 384 U.S. 436, 445 (1966). Thus, because "[t]he defendant clearly has the right to reassert his right to remain silent at any time[,] when a defendant ceases to answer questions there is a distinct possibility that he is relying on this right." Note, Protecting Doyle Rights After Anderson v. Charles:  The Problem of Partial Silence, 69 Va.L.Rev. 155, 166 (1983) (footnote omitted). See also, Wainwright v. Greenfield, 474 U.S. 284, 293-94, 294 n.12  (1986) (citing this law review article with approval and reiterating Doyle's concern that, given the "insolubly ambiguous" character of post-Miranda silence, fundamental fairness requires that the government not breach its "implied assurances" that silence will not be used against the defendant).

Thus, for example, in United States v. Canterbury, the Tenth Circuit held that the defendant's "partial silence," meaning that defendant responded to some post-Miranda questions but refused to answer others, "[did] not preclude him from claiming a violation of his due process rights under Doyle." 985 F.2d 483, 486 (10th Cir. 1993). Likewise, in Booton v. Hanauer, the First Circuit found the prosecutor committed constitutional (albeit ultimately harmless) error under Doyle in introducing testimony from a deputy sheriff that the defendant "refused to answer any more questions." 541 F.2d 296, 298-99 (1st Cir. 1976). See also United States v. Harrold, 796 F.2d 1275, 1279-80 (10th Cir. 1986), cert. denied, 479 U.S. 1037 (1987) (finding where defendant answered some questions but not others after receiving Miranda warnings, his "partial silence" could not be used against him at trial pursuant to Doyle); United States v. Baker, 432 F.3d 1189, 1222 (11th Cir. 2005), cert. denied, 126 U.S. 1809 (2006) (finding prosecutor's question to agent "unnecessary and inappropriate" because it suggested that defendant had terminated interview and refused to

13

answer further questions, but finding no <u>Doyle</u> violation based on this single reference); <u>United States v. Shavers</u>, 615 F.2d 266, 268-69 (5th Cir. 1980) (finding prosecutor's comment on defendant's silence was reversible <u>Doyle</u> error where defendant spoke to FBI agent who came to see him but did not tell him exculpatory statement later revealed at trial because he had been advised not to talk to the agent); <u>United States v. Ghiz</u>, 491 F.2d 599, 600 (4th Cir. 1974) (finding reversible error in FBI agent's testimony that <u>Mirandized</u> defendant "stated that he did not desire to answer any questions concerning" the crime).

To be sure, there is a distinction here in that defendant did not invoke a right to discontinue making verbal statements.  Rather, he declined to memorialize his verbal statements in a sworn written statement.  However, this is not a distinction which diminishes Jenkins' <u>Doyle</u> position (it may, in fact, strengthen it) and the government has not argued to the contrary.  <u>See, e.g.</u>, <u>United States v. Christian</u>, 22 M.J. 519, 521-22 (NMCMR 1986) (holding that government's reference to appellant's refusal to provide written statement after oral interview violated <u>Doyle</u>, because the right to remain silent could be invoked at any time and constituted a "most fundamental" exercise of his rights which was not properly alluded to at trial).[9]  Indeed, a person who has been given his <u>Miranda</u> warnings and therefore knows he is a potential suspect in a crime may make the perfectly rational decision to answer all of law enforcement's questions, but then decide it is not in his interest to go the further step

---

[9] <u>But see</u>, <u>Strickland v. Lee</u>, 471 F.Supp.2d 557, 623 (W.D.N.C. 2007) (holding in habeas case without citation to any other authority that reference to defendant's declination to provide written statement following oral interview did not violate <u>Doyle</u> because it was not a comment on silence but, rather, reflected defendant's choice not to repeat in writing what he had just said out loud and merely described conclusion of interview and further finding that error, if any, was harmless).

of handing over to his potential prosecutors a sworn written statement concerning his activities.  This appears to be what happened here.  Both Jenkins and Inspector Brown agreed that Jenkins voluntarily answered all of Brown's questions; he simply declined to memorialize his answers in a sworn written statement.  In doing so, Jenkins, a police officer familiar with criminal investigations and the potential prosecutorial use of sworn statements, was acting in his own interest and within his constitutional rights.[10]  Thus, absent some other basis upon which references to Jenkins' post-Miranda refusal to provide a written statement were admissible, we are faced with a Doyle violation.[11]

The government argues that references to Jenkins' declination were admissible to rebut the impression that Jenkins was cooperative with the investigation.  Indeed, "Doyle does not prohibit prosecutors from commenting on a defendant's post-Miranda silence for all purposes."  O'Keefe, 461 F.3d at 1348 (emphasis in original).  And, as the government argues here, "a prosecutor may question a defendant about his post-arrest silence for the

_____

[10]See Hill v. Turpin, 135 F.3d 1411, 1415 (11th Cir. 1998), in which the Eleventh Circuit recounted the state court trial judge's efforts to provide a curative instruction in the face of a Doyle violation by explaining to the jury:
> [I]t has been called to my attention . . . that when [the prosecutor] asked the defendant about what happened, he said he didn't want to make any statement at that time until he talked to his lawyer.  He had a right to make that statement.  You don't have to make any statement at all until you talk to your lawyer.  It is a pretty good idea, to tell you the truth.  That's what I would do, so there is no unfavorable inference to be drawn from that.

[11]Although in its papers the government argued that Jenkins waived any Doyle protection once he engaged in post-Miranda conversation with Inspector Brown, at oral argument the government seemed to alter this position by agreeing that unless defendant opened the door to testimony about his refusal to give a sworn written statement, this line of questioning would violate Doyle.

purpose of rebutting the impression that he cooperated with law enforcement authorities." Id.  Thus, "'[w]hen a defendant attempts to convince a jury that he was of a cooperative spirit, <u>Doyle</u> does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.'" Id. (citation omitted).  "Having raised the question of his cooperation" a defendant is deemed to have "'opened the door to a full and not just a selective development of that subject' because a defendant cannot 'freely and falsely create the impression that he has cooperated with the police when, in fact, he has not.'" Id. (citing <u>United States v. Fairchild</u>, 505 F.2d 1378, 1383 (5th Cir. 1975)).  Accordingly, "'[a]ssuming the law would have excluded from evidence [a defendant's] silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created to protect him.'" Id. (citing <u>Fairchild</u>, 505 F.2d at 1383).

In <u>O'Keefe</u>, a child pornography possession case, the Eleventh Circuit applied these principles to find that the prosecutor permissibly made reference to O'Keefe's failure to give statements after O'Keefe "opened the door" at trial by suggesting that his activities in creating websites were an effort to act as a citizen vigilante working with law enforcement to catch internet child predators.  461 F.3d at 1348-49.  Likewise, in <u>Fairchild</u>, where the defendant was convicted for his involvement in a car theft ring, the Court found no error in the prosecutor's comments on Fairchild's refusal to make a post-<u>Miranda</u> statement where Fairchild's counsel had asked an FBI agent at trial whether "Mr. Fairchild cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted[.]" 505 F.2d at 1383.  The defendant having posed such a question, the Court found that any constitutional protection afforded his silence was waived.  Id.  The Court further explained:

16

> We recognize that some may argue that the exercise of a constitutional privilege may not be considered evidence of lack of cooperation. We would point out, however, that defense counsel was obviously trying to create the impression that Fairchild actively cooperated with the police in order to build up his client in the eyes of the jury . . . . Thus, the question is not whether the exercise of a constitutional privilege to remain silent is, in the abstract, evidence of lack of cooperation but whether it refutes an inference of active cooperation. We believe that it does.

Id. at 1383, n.8.

The government contends that Jenkins created a similar situation here when he "opened the door" to testimony about his silence by leaving a false impression of cooperation through cross-examination of Inspector Brown. Defendant argues that his cross of Brown was designed to elicit favorable testimony left out during the government's direct examination of Inspector Brown including, most particularly, the crucial testimony that Jenkins told Brown that Jenkins had not seen the false statements on his loan documents until Brown presented those documents to him during the August 13, 2001 interview. Defendant's efforts to elicit this testimony were met with resistance by Brown and the Court had to instruct Inspector Brown to provide direct answers to Jenkins' counsel's direct questions. This later led the two into a rhythm whereby counsel would ask, "Isn't it true that Mr. Jenkins told you . . ." followed by an affirmative response by Brown, and a subsequent follow-up by counsel, "And didn't your investigation then confirm that . . ." followed by another affirmative response by Brown.

Having sat through this testimony and now having again reviewed it, the Court is convinced that Jenkins did not create a "false impression of cooperation" such that he "opened the door" to prosecutorial commentary on his refusal to give a written statement.

Nor at trial did Jenkins try to paint a picture inconsistent with the information he gave Inspector Brown during the interview; indeed Jenkins' trial position was the same position he took with Inspector Brown during the interview.  This case is therefore distinguishable from O'Keefe and Fairchild.  Accordingly, the prosecutorially elicited[12] testimony from Brown that Jenkins refused to provide a sworn written statement was a Doyle violation.

However, depending on the circumstances, one stray comment regarding a defendant's silence is not necessarily fatal.  See Greer, 483 U.S. 756 (holding no Doyle violation where court sustained objection to only question touching on silence, jury was instructed to disregard any questions to which an objection was sustained, and no further attention was drawn to the matter); Baker, 432 F.3d at 1222 (single brief reference to defendant's silence in course of 31 day trial was not grounds to grant mistrial).  Unfortunately here, however, the prosecutor erroneously advised the Court at sidebar that Inspector Brown had not answered the question regarding Jenkins' declination and, because the Court believed that to be true, no curative instruction was given and the objection was not ruled on within the hearing of the jury.

The government argues that the harm resulting from any violation was cured by defendant's own subsequent reference to his failure to give a written statement.  However, defendant, who had not spoken with his counsel between Brown's testimony and taking the stand, likely heard Brown's testimony and was unaware that he should avoid this issue.

---

[12]The government has not argued (and the Court would not find) that Brown's response regarding Jenkins' refusal to provide a written sworn statement was an unsolicited surprise. The prosecutor's question which elicited the testimony was, "At the end of your interview of the defendant, did you ask him to do anything?"  Doc. 72 at Tr. 34.

18

Defense counsel's following question merely clarified Jenkins' surprise response and then counsel quickly moved on, even preventing defendant from offering an explanation of why he declined to provide the written statement.  The government, having committed a <u>Doyle</u> violation by raising this issue in the first place, inexplicably then committed another by directly asking Jenkins on cross-examination whether he declined to give a written statement, strongly implying this meant he was not completely honest in answering Inspector Brown's questions:

> Q:    [Y]ou told us on direct examination that when you met with Inspector Brown that you didn't have anything to hide, right?
>
> A:    No.
>
> Q:    And that you were completely honest and forthcoming, correct?
>
> A:    Correct.
>
> Q:    And yet you declined to give a written statement; isn't that correct?

Doc. 72 at Tr. 92-93.  This improper line of questioning, directly equating the valid exercise of Jenkins' right to remain silent with lack of forthrightness, was done after the Court had previously instructed the government to stay away from this line of questioning.[13]

Viewed in the context of the entire trial, the Court cannot find the <u>Doyle</u> errors here to be harmless.  The first reference alone resulted in the jury hearing evidence from a federal investigator that Jenkins had refused to provide a sworn written statement to the investigators.  Through no fault of defendant, this testimony was received by the jury without

---

[13]At oral argument on this motion, the government attorney acknowledged that, given the Court's previous ruling, she should not have asked these questions without getting a ruling from the Court first, saying that the "adrenaline" of the moment got the best of her.

a ruling on defendant's timely objection or a curative instruction of any kind.  See O'Keefe, 461 F.3d at 1348 (noting burden on defense to promptly bring error to court's attention); Tenorio, 69 F.3d at 1106 (noting that without benefit of a curative or limiting instruction to disregard comment on defendant's silence, defendant may have been "impermissibly convicted solely on the basis of [his] post-Miranda silence").  This was followed by the second Doyle violation which was committed even after the Court had instructed the government not to pursue the topic.  Moreover, Jenkins' trial testimony was consistent with the statements he gave during his interview with Inspector Brown, making it all the more likely that his choice to not give a written statement was motivated by his knowledge that he had a constitutional right not to do so.  Thus, Doyle's concerns with fundamental fairness as well as the "insolubly ambiguous" meaning of silence are both present here.  Additionally, the evidence of guilt was not overwhelming (the jury acquitted defendant on two of the six counts) and the jury's consideration of the defendant's credibility was the key determination to be made in reaching a verdict (see, for example, defense counsel's closing argument, explaining to the members of the jury that if they did not believe Mr. Jenkins, they must find him guilty).  "[W]here the case comes down to a one-on-one situation, i.e., the word of the defendant against the word of the key prosecution witness . . . the importance of the defendant's credibility becomes so significant that prosecutorial error [in] attacking that credibility cannot be harmless beyond a reasonable doubt."  Tenorio, 69 F.3d at 1107, quoting Velarde v. Shulsen, 757 F.2d 1093 (10th Cir. 1985) (per curiam). Weighing these factors, the Court cannot find beyond a reasonable doubt that the Doyle errors here are harmless.  See Tenorio, 69 F.3d at 1107 (reversing conviction and remanding for new trial

20

upon finding that <u>Doyle</u> errors not harmless beyond a reasonable doubt).

### 2.     Admission of exhibit

Jenkins also seeks a new trial on the grounds that a document (Government Exhibit 1E, hereinafter, "Gov't 1E") was improperly admitted into evidence and created unfair prejudice. Jenkins asserts that the admission of this document violated not only the hearsay rule but his confrontation clause rights, as articulated in <u>Crawford v. Washington</u>, 541 U.S. 36, 38 (2004).

Gov't 1E is a ten page composite exhibit of Bank of America records showing activity related to one of the Jenkins loans. The exhibit was one of several multi-page documents admitted at trial during the testimony of Laura VanZee, the vice president and senior manager for Bank of America. (<u>See</u> Doc. 92, VanZee trial testimony). Ms. VanZee was called to testify immediately after the government's first witness, Christopher McQueen. She provided descriptions of various bank documents related to the Jenkins/J-Nice Security loans, including bank statements on a business line of credit (Gov't 1B), a credit line check (Gov't 1C), a series of payment coupons, checks, and cash tickets (Gov't 1D) and loan approval documents (Gov't 1F). Ms. VanZee described Gov't 1E as follows:

> These are actually records off of our host system or computer system at the bank. . . . That's the records of the phone calls that are made to the client and the conversations that a collector has with the client. And it will even include attempted contacts if we- - the collectors work off what we call an auto dialer. So the phone will automatically dial a phone number on a path-to account and it will note that in the system, this is where those records are maintained. And then when they do actually speak with the client, that is noted in the system as well. And it would include things like any promises to pay or any extenuating circumstances that may cause a person not to be able to pay the note back and accept a payment promise at a later date.

Doc. 92 at Tr. 6-7.  Ms VanZee testified that the phone call records are "summaries of the telephone conversations."  Doc. 92 at Tr. 7.  The government advised the Court that the parties had stipulated as to authenticity and moved for the admission of the 56 pages of exhibits described by Ms. VanZee.  Jenkins' counsel moved for leave to voir dire the witness, which the Court permitted.  Jenkins' counsel questioned Ms. VanZee about several of the exhibits and Government Exhibits 1B, 1C, and 1D were admitted without objection.  The questioning of Ms. VanZee regarding Gov't 1E included the following exchange:

Q:      [W]hen the collector calls, they input information as to what the gist of their conversation was with the person?

A:      Correct.

Q:      Now, you talked before about the gobbledegook that goes into these codes. Is there a code in Government's Exhibit 1E that would let the bank know who the actual person is that made the call?

A:      Yes.

        . . .

Q:      I think you said yes, that you can tell who the person is who called?

A:      Yes.  Because this particular type of line of credit was booked on our credit card system, we call the owner of the account, the cardholder.  And there were cards that were issued on these lines of credit, too.  So CH stands for cardholder.  So anytime you see in here, CH will make payments, CH said, CH did, CH is the owner of and code word for J-Nice Security.  That would be Mr. Jenkins.

Q:      Well, what about the person that's making the call to Mr. Jenkins?  Can you tell from the codes who that person is, or can that be identified?

A:      Yes.  That would be - - the number code that's next to the time, that is the operator ID who made the call.  <u>I wouldn't know who that individual was, but we could get that information.</u>

22

Q:    <u>Okay.  So that person could be contacted and could actually be up on the witness stand testifying, if you know who the person is?</u>

A:    <u>Right.</u>

Doc. 92 at Tr. 14-16 (emphasis added).

Jenkins' counsel objected to the admission of Gov't 1E on grounds of hearsay.  The government responded that Gov't 1E was "simply a business record" that had been properly authenticated and did not raise a hearsay concern.  Doc. 92 at Tr. 16.  Jenkins' counsel responded, explaining that he did not have the ability to cross-examine the document, but if a person were sitting in the witness stand, he could ask them questions about whether they remembered making the call and what procedures were used to input the information.  Doc. 92 at Tr. 17.  The Court overruled the objection and Gov't 1E was admitted into evidence.

The prosecution's questioning of Ms. VanZee then continued, eventually returning to Gov't 1E.  Ms. VanZee again testified as to how the phone call records originate, explaining that a computer dials the number and if a connection is reached, the collector is "required to put comments into the computer for . . . permanent record purposes."  Doc. 92 at Tr. 22.  Ms. VanZee stated that different collectors may be placing calls to the same account holder and the record lets the subsequent collector "know what the [previous] conversation was about."  Doc. 92 at Tr. 22.  The prosecutor then asked Ms. VanZee to interpret a line of text from page 8 of Gov't 1E.  It reads as follows:

062700 17:25   004379 TB OR    SANDERSON) CH CI SD THAT IS GETTING HOME EQUITY LOAN AN WILL BE PAYING ACCOUT OFF SD JUST DID THE PAPERWORK THIS MORNING AND WILL KEEP ME POSTED. .J NICE SECURITY NO LONGER EXSIST ADV SOA VAI

23

Ms. VanZee explained that the first numbers reflect the date of the call, June 27,

2000, and that part of the text was in code, that the first letters "CH" meant "cardholder" and

the next two, "CI" meant "called in."  She then read the remainder of the entry:

> ["]Said that is getting home equity loan and will be paying off.  CI[14] just did the paperwork this morning and will keep me posted.  J-Nice Security no longer exists.[15]  advised["]- - and then the rest I don't know.  I don't know what that code means. ["]SO/AV["],[16] I don't know what those codes are.

Doc. 92 at Tr. 23.  Jenkins' counsel cross-examined Ms. VanZee, asking again about the

phone records.  Ms. VanZee testified that the records are notes of telephone conversations

that the collectors have with cardholders, that the notes are the only records the bank has

about such conversations, and that the collector could be identified by his or her identification

number and called to testify, assuming whomever it was could be found.  On redirect, Ms.

VanZee estimated that individual call center collectors make "hundreds" of such calls per

day, and that, even if that were an exaggeration, she personally recalled making 35 or 40

calls a day when she was a collector before the computerized dialing system was

implemented, and collectors using such a system could certainly place "many, many" calls

in a day.  Doc. 92 at Tr. 29.

During the remainder of the trial, the government took advantage of all opportunities

to display page 8 of Gov't 1E to the jury, using it to demonstrate its theory that Mr. Jenkins

---

[14]The actual text of page 8 of Gov't 1E has the letters "SD", not "CI" as Ms. VanZee testified.

[15]The actual text of page 8 of Gov't 1E uses the misspelled word, "EXSIST."

[16]The actual text of page 8 of Gov't 1E has the letters "SOA VAI", not "SO/AV" as Ms. VanZee testified.

had told the unidentified collector on June 27, 2000 that J-Nice Security "no longer exists" and, because J-Nice Security *never* existed, the statement "J-Nice Security *no longer* exists" was an obvious lie by Jenkins which showed that he knew his loans were fraudulently obtained.  <u>See, e.g.</u>, Doc. 71 at Tr. 15 (government using exhibit during testimony of Inspector Brown to highlight inconsistency between Jenkins' statement to Brown that J-Nice never existed, and language on Gov't 1E that "J-Nice no longer exists").   In Jenkins' testimony, he could not recall any particular telephone conversation with a bank collector back almost seven years earlier in 2000, but he specifically denied that he had told a collector that "J-Nice Security no longer exists."   Doc. 72 at Tr. 96-97.   During the final moments of the rebuttal portion of its closing argument, in explaining how the evidence demonstrated Jenkins' intent to defraud, the government made its final use of this exhibit, stating:

> That June 2000 phone call with Bank of America, where there's a quote, J-Nice Security no longer exists- - and that was for 18 months after the loan closing.  The defense asked Ms. VanZee whether the government could have brought in the person who actually made that call to talk about it.
>
> And I suppose that we may have been able to do that.  But who do you think is talking to the bank 18 months after the loan is already closed?  It's the defendant.
>
> <u>And it's not that J-Nice Security no longer existed.  It was that J-Nice Security never existed, another lie, another way that you can see the intent to defraud.</u>

Doc. 84 at Tr. 46 (emphasis added).

In his motion for a new trial, Jenkins argues that Gov't 1E should have been excluded on the basis of his original hearsay objection.  The first question, therefore, is:  Was this

evidence hearsay?  Hearsay is a statement, other than one made by the declarant while testifying at trial, offered for the truth of the matter asserted.  Fed.R.Evid. 801(c).  Here, the statement, "J-Nice Security no longer 'exsists'," was not being offered for the truth of the matter asserted- - no one is arguing about the "truth" of whether J-Nice Security no longer exists.  What was being offered for the truth of the matter asserted is that Mr. Jenkins,  to whom the bank collector spoke on the telephone regarding this loan account, *said* that 'J-Nice Security no longer exsists.'  Thus, in this somewhat unique circumstance, it is not the content of a statement that is being offered for its truth but, rather, the fact of the utterance of the statement itself.

A similar situation occurred in T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 826-28 (11th Cir. 1991), in which the plaintiff sought to support its tortious interference claim by admitting allegedly false statements about the plaintiff's products purportedly made by the defendant's employees to the plaintiff's customers and reported by those customers to the plaintiff's employees.  In seeking to admit the statements at trial through the testimony of the plaintiff's employees, the plaintiff argued that the testimony was not hearsay because the statements were not offered for the truth of the matter asserted, and that, in fact, the plaintiff specifically denied the truth of the content of the statements about its products.  Id. at 826.  In rejecting this argument, the Eleventh Circuit stated that plaintiff "misunderstands the hearsay analysis of this evidence;" that while the plaintiff correctly argued that the defendant's employees' statements were not hearsay, what the plaintiff was "trying to prove" was "that [the defendant's] employees made the comments," and the source of that information, the plaintiff's customers, were out-of-court declarants.

26

Id. The plaintiff's employees' testimony regarding those statements was therefore hearsay and, as no exception applied,[17] the Eleventh Circuit reversed the denial of judgment notwithstanding the verdict, finding that the evidence supporting the verdict was inadmissible hearsay. Id. at 827-29. See also, Cody v. Harris, 409 F.3d 853, 860 n.3 (7th Cir. 2005) (explaining that newspaper article was not being offered for truth of defendant's statement contained therein but for proof that defendant made the statement to the reporter; thus article was inadmissible hearsay absent testimony from reporter regarding his method of reporting or other testimony that would show article's trustworthiness). As in T. Harris Young and Cody, the statement offered here for the truth of the matter asserted is the statement of an out-of-court declarant (the unidentified bank collector) that someone (Jenkins, according to the government) said something ("J-Nice Security no longer 'exsists'") to the out-of-court declarant. This is inadmissible hearsay unless one of the hearsay exceptions applies.

At trial, the government secured the admission of this statement through Fed.R.Evid. 803(6), the business record exception to the rule against hearsay. "The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." United States v. Bueno-Sierra, 99 F.3d 375, 378 (11th Cir. 1996) (citation omitted). And indeed, here, Jenkins did not object to the determination that this record was created as part of Bank of America's regularly conducted business activity nor to Ms. VanZee's testimony about the

_____

[17]The Court considered and rejected the state of mind exception (Rule 803(3)) and the business records exception (Rule 803(6)) as possible grounds to admit the hearsay evidence.

bank's records generally.  Rather, Jenkins' focus is on the "trustworthiness" and "reliability" of this particular statement in this document, arguing that, without testimony from the actual bank collector who handled the call and took the notes reflected in the particular line on page 8 of Gov't 1E, Jenkins had no opportunity to probe whether the caller was actually talking to Jenkins or to someone else; whether it was that particular caller's habit to record a customer's exact words or to paraphrase them; whether the notes were taken contemporaneously or were recreated from earlier sketch notes; and whether the caller was usually accurate or prone to errors.

In <u>United States v. Petrie</u>, the Eleventh Circuit affirmed the trial court's ruling that business records offered through the testimony of a company secretary were inadmissible. 302 F.3d 1280, 1287-88 (11th Cir. 2002).  In rejecting the documents' admission, the trial judge noted that the secretary (like Ms. VanZee here) was able to testify

> as to how the documents [were] maintained, filed and retrieved, [but] <u>she simply [was] not able to testify concerning the origination and compilation of the documents.  In other words, [the secretary] simply [could not] testify about the initial link in the chain producing the record– that is, whether the circumstances surrounding the origination and compilation of the documents indicate reliability and trustworthiness.</u>

<u>Id.</u> at 1288 (emphasis supplied).  The trial judge went on to explain how, in that case, "such testimony [was] particularly necessary" because the case involved allegations of money laundering and the defendant sought to admit financial documents that defendant argued demonstrated the legitimacy of his company's transactions.  <u>Id.</u> at 1287-88.  The trial judge determined that the records were inadmissible because the secretary's testimony was insufficient to meet the required showing of trustworthiness, a determination the Eleventh

Circuit affirmed on appeal.  Id. at 1288.

Likewise, in United States v. Crumpler, No. 06-13637, 2007 WL 1095136 (11th Cir. Apr. 13, 2007) (slip copy), a fraud and false statements case, the Eleventh Circuit affirmed the trial court's decision to exclude notes offered by the defendant as business records, finding that although the records were created and kept as part of a regular business practice and supervisors testified as to their authenticity, neither of the supervisors could testify "about the initial link in the chain producing the records- - that is whether the circumstances surrounding the origination and compilation of the documents indicate reliability and trustworthiness." Crumpler, 2007 WL 1095136, * 3 (citing Petrie, 302 F.3d at 1288).  See also, Ricciardi v. Children's Hosp. Med. Ctr., 811 F.2d 18, 20-23 (1st Cir. 1987) (affirming exclusion of doctor's handwritten note as inadmissible hearsay finding that document failed to meet business record exception because doctor, who usually spoke with staff attending before, during and after surgery, had no personal knowledge of event and simply could not recall who provided the information contained in the note); Petrocelli v.Gallison, 679 F.2d 286, 289-91 (1st Cir. 1982) (affirming exclusion of hospital record where notes were "simply too inscrutable" to meet business record exception because it was impossible to tell whether "cryptic" notes reflected medical opinions or were record of what patient or his wife reported; noting that "pure guesswork and speculation" would be required "to divine the source of the [ ] information" and, once admitted as business record, there would be no opportunity to cross-examine physician who made them);  Meder v. Everest & Jennings, Inc., 637 F.2d 1182, 1186-87 (8th Cir. 1981) (finding business record exception did not apply and reversible error resulted from admission of highly prejudicial testimony from officer regarding content

29

of his police report where officer could not testify as to who had provided information contained within the report or when or under what circumstances it was created, thereby robbing plaintiff of ability to test reliability or trustworthiness);

Here, the relevant passage from Gov't 1E suffers from similar problems and does not meet the threshold of reliability and trustworthiness necessary to have allowed the Court to place it before the jury.  Although Ms. VanZee testified generally as to how these records are created, she had no personal knowledge regarding the actual entries.  She described the notes as a "summary" of a collector's calls.  Thus, it is not clear that the remark "J-Nice Security no longer exsist" is a statement taken from a person, as opposed to the collector making some sort of notation.  Nor is it at all established that this precise language is a direct quote from Jenkins, as the government contends, or just an imprecise summary by the collector.[18]  Additionally, while Ms. VanZee testified as to what some of the coded language meant, she did not know what some of the other codes meant and these undeciphered codes ("[advise] SOA VAI"), immediately follow the remark "J-Nice Security no longer exsist," rendering it impossible to discern the full meaning of the remark.  Furthering the mystery, there is an unexplained series of punctuation (" . .") separating this remark from the previous part of the entry regarding the collector's conversation with the cardholder.  This is consistent with the rest of Gov't 1E, which is full of undeciphered entries.  For example, while Ms. VanZee testified that "CH" means "cardholder," "CI" means "called in," and "ADV" means "advised," most of the entries contain other "codes" that have not been explained.  See, e.g.,

_____

[18]The now important difference between "no longer exists" and "never existed" would not have been meaningful to the collector making the entry.

Gov't 1E at 7, entry for June 9, 2000 ("JSERDEN=TB LM W/AM").  Thus, there is no ability to glean the meaning of the relevant entry from its context within the rest of the exhibit. Additionally, while Ms. VanZee testified that "CI" meant "called in," she further testified that Gov't 1E is a record of autodialer calls placed by the bank to account holders; thus, it is not even clear whether the relevant text is a summary of a call placed to the bank by someone or from the bank by the collector.

Finally, although the government has argued that "common sense" supports a finding that Jenkins is the source of the information noted by the collector, this document does not establish that the bank collector spoke with Jenkins.  Jenkins is not mentioned by name in this entry.  Moreover, this same exhibit appears to show other calls about the delinquency of this same account placed to a person other than Jenkins, a "Teonta Baldwin" and/or "TOENTIABALDWIN."  See Gov't 1E at page 7, entry for April 12, 2000 ("MLAHS LOOKED UP TOENTIABALDWIN. HER # 907-791-5271. LFT MSSG. ADVSD NEED CB TDY."); entry for April 17, 2000 ("MLAHS LFT MSSG ON V-MAIL FOR TEONTA BALDWIN, ADVSD IMPRTNT THT I HEAR FRM HER.").  Furthermore, while many of the other names referenced in the records may be bank employees or collectors, Marva Watkins, one of Jenkins' fellow police officers who was a partner in the day care business, is mentioned in these records as well.  See Gov't 1E at page 5, entry for April 26, 1999 ("V HICKS ORD CPY OF 11-98 THRU 4-99 STMNT PR MARVA WATKINS WILL FRWD REFERRAL FORM"). Without the testimony of the bank collector who participated in this call, it cannot be reliably

shown that Jenkins is the person who conveyed the information to the bank collector.[19]

As in <u>Petrie</u>, the importance of this exhibit to the contested issues (which was not obviously apparent to the Court at the time the government moved for its admission into evidence) requires the Court to place particular emphasis on its trustworthiness. 302 F.3d at 1287-88. Now, upon reflection, the Court finds Gov't 1E is "simply too inscrutable" to meet the business record exception because "pure guesswork and speculation" would be required "to divine the source of the information" contained therein. <u>Petrocelli</u>, 679 F.2d at 291. Permitting this exhibit to be admitted under these circumstances deprived defendant of the key tool in the defense arsenal- - the opportunity to cross-examine the source of the evidence being provided to the jury. <u>California v. Green</u>, 399 U.S. 149, 158 (1970) (citing <u>Wigmore</u> for proposition that cross-examination is the "greatest legal engine ever invented for the discovery of truth"). While testimony from the bank collector who actually handled the call might not guarantee that this document would meet the reliability and trustworthiness threshold necessary to admit it under the business record exception of Rule 803(6), without such testimony, this hearsay document simply fails to meet that standard.

At trial, Jenkins testified that he did not know that the documents he signed contained false information. The government countered that testimony, in part, by repeatedly impressing upon the jury that Jenkins knew what he was doing and that he displayed the requisite intent to defraud when he told a bank collector that "J. Nice Security no longer

---

[19]If it turned out that someone other than Jenkins conveyed this information to the bank collector, the Court suspects the statement would no longer have any relevance as it would not be probative of Jenkins' intent to defraud.

exists." Those were among the final words from the prosecution to the jury. Particularly given the significance placed on this evidence by the government, the Court's error in admitting Gov't 1E is such that the interest of justice requires the Court to grant Jenkins a new trial pursuant to Fed.R.Crim.P. 33.[20]

**III.**    **Conclusion**

This case has already gone on far too long. Moreover, I do not take lightly the decision to upset a jury verdict. I do so only with reluctance and after much reflection. However, this was a very close case, as demonstrated by the jury's partial acquittal. Thus, I cannot say that absent these errors, the jury's verdict would have been the same. Therefore, for both reasons stated, each of which I find independently sufficient, the interest of justice requires me to grant a new trial.

Accordingly, it is hereby

**ORDERED**:

1.     Defendant's Motion for Reconsideration of the Motion to Dismiss Indictment Because of Pre-Indictment Delay (Doc. 75), Defendant's Motion for Reconsideration of Motion to Dismiss on Sixth Amendment Grounds (Doc. 76) and Defendant's Post-Verdict Motion for Judgment of Acquittal (Doc. 77) are **DENIED**.

2.     Defendant's Motion for New Trial (Doc. 74) is **GRANTED**.

3.     The Court's January 29, 2007 Adjudication of Guilt (Doc. 73) is **VACATED**.

---

[20]Given the Court's ruling on the hearsay issue, the Court need not address defendant's confrontation clause argument premised on Crawford v. Washington, 541 U.S. 36 (2004).

4.       This case is hereby set for a **telephone status** on **June 25, 2007 at 4:00 p.m.**[21] and trial on the undersigned's **July 2-20, 2007 trial term**.

**DONE AND ORDERED** at Jacksonville, Florida this 5th day of June, 2007.


TIMOTHY J. CORRIGAN
United States District Judge


s.
Copies:

counsel of record

Probation
Pretrial Services

---

[21]Counsel for the government shall initiate the conference call by calling counsel for defendant and then calling the Court's polycom telephone line:  (904) 549-1949.